IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENDA MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3221-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brenda Miller seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred (1) in failing to give more weight to the opinions of treating physician, Dr. Robinson, and examining physician, Dr. Corsolini; (2) in assessing a residual functional capacity without including a function-by-function assessment of plaintiff's ability to do work-related activities; and (3) in finding that plaintiff was non-compliant with treatment without determining whether the failure to follow prescribed treatment was justifiable. Plaintiff also argues that the Appeals Council improperly failed to remand the case for consideration of newly-offered evidence. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On July 7, 2008, plaintiff applied for disability benefits alleging that she had been disabled since August 23, 2007. Plaintiff's disability stems from back and neck injury, back and neck pain, and anxiety attacks. Plaintiff's application was denied on October 17, 2008. On February 4, 2010, a hearing was held before an Administrative Law Judge. On May 27,

2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On March 21, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

*III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

3

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $ 1,859.97 | 1992 | $ 18,253.84 |
| 1975 | 1,110.50 | 1993 | 15,930.01 |
| 1976 | 1,168.50 | 1994 | 20,020.97 |
| 1977 | 4,303.67 | 1995 | 24,092.80 |
| 1978 | 6,109.75 | 1996 | 26,538.78 |
| 1979 | 7,688.94 | 1997 | 29,005.32 |
| 1980 | 8,409.74 | 1998 | 28,984.00 |
| 1981 | 9,818.46 | 1999 | 30,952.80 |
| 1982 | 4,379.59 | 2000 | 31,223.55 |
| 1983 | 8,546.05 | 2001 | 23,043.56 |
| 1984 | 8,138.99 | 2002 | 0.00 |
| 1985 | 9,066.17 | 2003 | 1,859.23 |
| 1986 | 11,901.60 | 2004 | 1,375.15 |
| 1987 | 12,795.30 | 2005 | 6,300.89 |
| 1988 | 14,838.40 | 2006 | 9,335.67 |
| 1989 | 16,458.55 | 2007 | 8,392.16 |
| 1990 | 16,731.92 | 2008 | 0.00 |
| 1991 | 10,860.30 | 2009 | 0.00 |

(Tr. at 122).

4

Plaintiff's employment from 1985 through 2001 was with the Department of Agriculture (Tr. at 123-124, 135). In 2002 she had no reported earnings. In 2003 she began working for the Laclede County R-1 School District as a cook, and worked there through 2006 (Tr. at 124-125, 135). Also in 2006 through 2007 she worked for Employer Advantage (earning $799 of that in 2007) (Tr. at 125). Finally, in 2007 she worked for Central Bank earning $7,593.16 (Tr. at 125).

**Disability Report**

In an undated Disability Report plaintiff said she stopped working on August 23, 2007 (Tr. at 134). When asked why she stopped working, plaintiff wrote, "After 90 days my performance at the job wasn't good and I was let go. My back injury kept me from performing at my best." (Tr. at 134).

**Function Report**

In a Function Report dated September 2, 2008, plaintiff described her day as beginning at 4:30 a.m. (Tr. at 142). She has problems getting out of bed due to pain. She fixes breakfast. She spends most of her morning sitting in a chair with a seat massager. She can get up and down as needed but remaining in one position for a period of time is difficult. She fixes a light lunch. Her husband helps with supper. She does laundry and sweeps. She cleans up after dinner then takes a warm bath to relax. She does very little driving. Plaintiff has no problem with personal care such as dressing, bathing, and caring for her hair (Tr. at 143). Plaintiff is able to prepare meals and can do baking for dessert (Tr. at 144). She prepares meals twice a day for about 30 minutes to an hour (Tr. at 144). She does not cook as often or as much as she used to (Tr. at 144).

Plaintiff is able to do cleaning and laundry (but no lifting), ironing and dusting (Tr. at 144). She goes outside daily by walking, riding in a car, or driving in a car (Tr. at 145). She is

5

able to go out alone (Tr. at 145). She drives as her back allows (Tr. at 145). She shops in stores, by phone, by mail and by computer for groceries, household items, and gifts weekly for approximately two hours (Tr. at 145).

Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs (Tr. at 147). She can stand for 30 to 60 minutes depending on her pain (Tr. at 147).

### Function Report

In a Function Report dated May 31, 2009, (after her initial denial but before the administrative hearing) plaintiff reported that she gets up around 6:00 a.m. (Tr. at 171). She does what she can around the house including dusting, laundry, and dishes (Tr. at 171). On bad days she cannot do anything but sit with the massager (Tr. at 171). She can make something for lunch but her husband or daughter usually handles supper (Tr. at 171). Plaintiff has no difficulty dressing but sometimes she has trouble getting into and out of the tub (Tr. at 172). Sometimes her husband helps her wash her hair (Tr. at 172). Plaintiff prepares one meal a day for one to one and a half hours (Tr. at 173). Plaintiff is no longer able to go out alone -- she has panic attacks and needs help due to medicine and anxiety (Tr. at 174). She was still able to drive (Tr. at 174). She shops in stores, by phone and by mail (Tr. at 174). Her daughter or husband goes to the store with her to push the cart and lift the bags (Tr. at 147). She goes once every two weeks for about two hours (Tr. at 174).

### B.    SUMMARY OF MEDICAL RECORDS

All contacts are with Dennis Robinson, D.O., unless otherwise noted.

01/21/2002 (Tr. at 313)
        Telephone call requesting refill of Xanax.
        No contact with plaintiff.
        Plaintiff's prescription was refilled.

6

02/11/2002 (Tr. at 314)
  Complained of sinus infection and requested medication refills.
  Physical exam was normal, including a normal back ("Back normal range of motion, no tenderness to palpation). The only abnormality was a sore throat.
  No treatment.

02/12/2002 (Tr. at 314)
  Telephone message stating that her neck is out, having spasms in neck.
  No contact with plaintiff.
  No treatment.

05/15/2002 (Tr. at 315)
  Complained that her neck and back were hurting and were stiff.
  On exam, plaintiff's neck was tender to rotation and was stiff but she was able to flex and extend normally. She had pain and tenderness in the thoracic area with pain to flexion and extension. She had cervical pain, decreased range of motion. There were no range-of-motion measurements provided.
  She was diagnosed with "unspecified backache"[1] and "somatic dysfunction noted".[2] Plaintiff was given "OMM [osteopathic manipulative medicine] using HVLA [high velocity low-amplitude thrust] [i.e., osteopathic manipulation], soft tissue and muscle energy technique." No medication was prescribed.

05/24/2002 (Tr. at 316)
  Telephone message which was not described any more than "Prevacid 30mg".
  Prevacid is an over-the-counter medication which reduces stomach acid.
  No contact with plaintiff.
  "Ok prn [as needed]"

06/14/2002 (Tr. at 316-317)
  Telephone message: "Lt [left] neck, shoulder down to lt hip killing her, can't hardly walk, pain med is working. Two knots on spine, gone now. Wants to know what she should do now."
  No contact with plaintiff.
  Dr. Robinson called in prescriptions for Medrol Dose Pack (steroid) and Vioxx (non-steroidal anti-inflammatory).

06/17/2002 (Tr. at 318)
  Plaintiff complained of a reaction to Medrol Dose Pack, "neck sore spasms, trigger points tender"
  Plaintiff had tenderness, pain, and decreased range of motion in her spine; however, Dr. Robinson did not provide range-of-motion measurements.

_____

[1]Diagnosis code 724.5 means "unspecified backache."

[2]An area of limited motion and physical tenderness.

7

Dr. Robinson assessed interstitial myositis (728.81) and unspecified backache (724.5). Plaintiff was given a steroid and Lidocaine injection.

07/17/2002 (Tr. at 319)
Plaintiff complained that her neck and back were hurting and were stiff.
Plaintiff had pain, tenderness and decreased range of motion; however, no range-of-motion measurements were provided.
Plaintiff was assessed with unspecified backache, and Dr. Robinson performed osteopathic manipulation.

08/21/2002 (Tr. at 320)
Plaintiff telephoned Dr. Robinson's office. "She had a question about appealing her employer re: unemployment."
No contact with plaintiff.
No treatment.

11/01/2002 (Tr. at 321)
Plaintiff wanted some moles removed from under her eyes.
Dr. Robinson performed an abbreviated physical exam. "No tenderness to palpation."
He removed plaintiff's moles.

04/03/2003 (Tr. at 321-322)
Plaintiff twisted her ankle.
Dr. Robinson observed that plaintiff's ankle was swollen. No other abnormality was noted.
Plaintiff was given an ankle brace and a prescription for Lorcet (narcotic).

04/24/2003 (Tr. at 322-323)
Plaintiff saw Dr. Robinson for a follow up on medication. "Still weaning off Paxil (antidepressant). Threw Xanax (treats anxiety) away. Still shakey [sic] and not sleeping well."
Plaintiff's physical exam was normal.
She was assessed with depression not otherwise specified and bipolar depression, moderate. No treatment is listed, although a list of medications is provided: Darvocet (narcotic, no refills), Effexor (antidepressant), Xanax (treats anxiety), and Zyprexa (treats bipolar disorder).

05/14/2003 (Tr. at 232-234)
Plaintiff saw Dr. Robinson for a medication follow up and stated that Effexor was no help. She said she was still depressed and her back hurt. The Zyprexa helped some and she had a little more energy.
A physical exam was performed. Her back had normal range of motion with no unusual swelling or pain. She seemed less depressed but had a poor self image. "Refuses to see psych".
She was assessed with bipolar depression and depression not otherwise specified and her Effexor dosage was increased. "Encouraged to stay active."

8

05/21/2003 (Tr. at 324-325)
    Plaintiff saw Dr. Robinson for a follow up on medication. She said her medications were not helping yet, although she was more alert, less anxious and was doing more. Plaintiff's exam was normal. Her back had normal range of motion with no unusual swelling or pain. Her musculoskeletal exam was "normal". Dr. Robinson reviewed the results of blood work.
    No treatment was provided.

07/22/2003 (Tr. at 326)
    Plaintiff's left shoulder and upper back were hurting.
    Plaintiff's neck and back were tender with decreased range of motion; however, no range-of-motion measurements were provided. No diagnostic studies were performed.
    She was assessed with low back pain (although only the cervical and thoracic spine were mentioned in the exam, not the lumbar spine) and muscle spasm.
    Plaintiff received a steroid and Lidocaine injection and was given a prescription for Darvocet (narcotic).

08/27/2003 (Tr. at 327)
    Plaintiff's back and neck were hurting and were stiff.
    During a physical exam, tenderness was noted in the neck and upper thoracic region. Muscle spasm was also noted. No diagnostic studies were performed.
    She was assessed with low back pain (again, with no mention of the lumbar spine in the entire record) and muscle spasm. Dr. Robinson performed osteopathic manipulation.
    Plaintiff was told to use ice and hot packs and "reduce bending or twisting the back for 24-48 hours."

12/02/2003 (Tr. at 328-329).
    Plaintiff complained of pain in her lower back, gallbladder attacks, and more depression.
    Dr. Robinson noted tenderness in plaintiff's neck, upper back, and left sacroiliac joint. No diagnostic studies were performed.
    Plaintiff was assessed with lower back pain (although the exam only noted tenderness in her neck and upper back) and right upper quadrant (abdominal) pain. She was prescribed Donnatal (treats irritable bowel syndrome) and Norflex (muscle relaxer) and was given osteopathic manipulation. She was told to use ice and hot packs and "reduce bending or twisting the back for 24-48 hours."

01/21/2004 (Tr. at 331-332)
    Plaintiff needed a refill on her medications and complained that her neck was hurting.
    Plaintiff's neck and upper back were tender with reduced range of motion; however, no range-of-motion measurements were provided. "No diagnostic studies performed."
    She was assessed with back pain and muscle spasm. She was given a prescription for Darvocet (narcotic). Osteopathic manipulation was performed. She was told to use ice and hot packs and "reduce bending or twisting the back for 24-48 hours."

9

02/24/2004 (Tr. at 332)
   Plaintiff was seen for a B12 deficiency.
   No exam was performed.
   A B12 shot was given.

05/17/2004 (Tr. at 333)
   Plaintiff complained of being tired all the time, but she denied depression.
   Plaintiff's physical exam was normal.  Her back had normal range of motion with no unusual swelling or pain.  "No diagnostic studies performed."
   She was assessed with muscle spasm, even though there were no complaints of muscle spasm and no observations of muscle spasm, and fatigue.  No treatment was provided.

06/30/2004 (Tr. at 334)
   Plaintiff had a follow up on her medication and said she was "doing much better."
   Plaintiff's exam was normal.  Her back had normal range of motion with no unusual swelling or pain.  Her extremities and joints all had normal range of motion with no swelling or pain.
   She was assessed with muscle spasm, even though there were no complaints or observations of muscle spasm, and generalized anxiety disorder.  No treatment was provided.

12/06/2004 (Tr. at 335)
   Plaintiff complained of sinus congestion.
   On exam she had normal range of motion in her extremities.
   She was assessed with sinusitis and was prescribed Allegra.

04/26/2005 (Tr. at 336-337)
   Plaintiff reported a possible pulled muscle in her lower back.
   On exam, pain, tenderness and muscle spasm were noted.  Straight leg raising was negative bilaterally.
   Plaintiff was given prescriptions for Lorcet (narcotic) and Flexeril (muscle relaxer).

05/25/2005 (Tr. at 338)
   Plaintiff saw Dr. Robinson and requested an adjustment due to low back pain.  She said her pain started after doing some extra housework.
   Dr. Robinson observed muscle spasm and plaintiff reported tenderness.
   He gave her a steroid and Lidocaine injection and prescribed Lorcet (narcotic), Darvocet (narcotic) and Flexeril (muscle relaxer).

07/21/2005 (Tr. at 338-339)
   Plaintiff complained of leg pain and tingling feet.
   On exam, Dr. Robinson noted normal range of motion with no joint tenderness or swelling in the upper extremities; normal range of motion in the knees, hips and ankles with no tenderness or swelling; straight leg raising was negative; muscle spasm and tenderness were noted in the lower back.  Mental status exam was normal.
   Dr. Robinson gave plaintiff a steroid and Lidocaine injection, and he prescribed Lorcet (narcotic).

10

08/31/2005 (Tr. at 339-340)

Plaintiff complained of low back swelling.

He performed an exam and noted pain, tenderness and muscle spasm in the lower back. Straight leg raising was negative bilaterally. Upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees, and ankles had normal range of motion with no tenderness or swelling. Mental status exam was normal.

He performed osteopathic manipulation and prescribed Skelaxin (muscle relaxer) and Lorcet (narcotic).

11/14/2005 (Tr. at 340-341)

Plaintiff complained of back pain.

He performed an exam and noted pain, tenderness and muscle spasm in the lower back. Straight leg raising was negative bilaterally. Upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees, and ankles had normal range of motion with no tenderness or swelling. Mental status exam was normal.

He performed osteopathic manipulation and prescribed Lorcet (narcotic) and Skelaxin (muscle relaxer).

12/21/2005 (Tr. at 341-342)

Plaintiff reported back pain radiating into her right leg. She said she had never had an MRI.

He performed an exam and noted pain, tenderness and muscle spasm in the lower back. Straight leg raising was negative bilaterally. Upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees, and ankles had normal range of motion with no tenderness or swelling. Mental status exam was normal.

He prescribed Lorcet (narcotic) and told plaintiff to let him know when she is ready to have an MRI and he would get one scheduled.

01/10/2006 (Tr. at 207, 343)

Plaintiff had an MRI performed by Mark Cobur, M.D., at the request of Dr. Robinson. She had a small left foraminal disk protrusion at L3-4, L4-5, and L5-S1 without nerve root compression. Dr. Robinson reviewed the MRI on January 12, 2006.

01/23/2006 (Tr. at 342, 344)

Plaintiff had a follow-up on her back. She said her medication was causing nausea, but her condition was "stable." Plaintiff reported that the Darvocet was not helping her back and neck pain.

He performed an exam and noted pain, tenderness and muscle spasm in the lower back. Straight leg raising was negative bilaterally. Upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees, and ankles had normal range of motion with no tenderness or swelling.

He prescribed Lorcet (narcotic).

11

02/28/2006 (Tr. at 209-215, 410-412)

Plaintiff saw Paul Olive, M.D., an orthopaedic specialist, and his physician's assistant complaining of back pain since 2005. She said she works on a concrete floor which seems to exacerbate her symptoms. She said the injections she had gotten from Dr. Robinson helped some. She had not participated in physical therapy. She admitted to smoking a pack of cigarettes a day for the past 25 years. Plaintiff denied any difficulty sleeping, fatigue, or psychological problems with the exception of anxiety. She reported only occasional joint pains and aches.

"Examination: Range of motion is satisfactory. She does not have much pain with extension. She has minimal tenderness over the involved area. She has no sign of trochanteric bursitis or hip pathology. Examination of the hips, knees, and ankles is unremarkable. Neurologic exam is intact.
Radiographs: of the lumbar spine are negative.
Diagnostic Studies: MRI scan is not diagnostic, in my opinion. She has some mild disc bulges in the foraminal area at L4-5 and L5-S1 that I do not feel are clinically significant.
Impression: I think this may represent a chronic strain.
Recommendations: We discussed physical therapy under the direction of a therapist but she lives in Conway and that may be difficult. We are going to start her on a home exercise program that I think will be of benefit and I will follow her as needed."

04/27/2006 (Tr. at 344-345)

Plaintiff followed up with Dr. Robinson for her back and reported that the orthopedic surgeon (Dr. Olive) had recommended continue home exercises, pain medication and muscle relaxers.[3]
He performed an exam and noted pain, tenderness and muscle spasm in the lower back. Straight leg raising was negative bilaterally.
He prescribed Lorcet (narcotic), Xanax (treats anxiety) and Cyclobenzaprine (muscle relaxer).

08/23/2006 (Tr. at 224, 346)

Plaintiff saw Belinder Kesterson, a physician's assistant in Dr. Robinson's office, complaining of sinus infection.
She was prescribed an antibiotic.

12/19/2006 (Tr. at 223, 346-347)

Plaintiff reported dizziness and hot flashes.
Plaintiff's exam was normal -- the upper extremities had normal range of motion, no joint tenderness or swelling. The hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status exam was normal. Curiously, there was no examination performed of her back.
Plaintiff was diagnosed with dizziness, vertigo, and menopausal disorders unspecified. She was prescribed hormone medication.

---

[3] I note that Dr. Olive's medical record does not discuss narcotics or muscle relaxers; he only recommended physical therapy exercises.

12

04/09/2007 (Tr. at 222, 347-348)
Plaintiff complained of feeling dizzy and said it felt like her right ear was clogged. On exam she had a red throat. Her neck was normal with normal range of motion and no tenderness. Upper extremities had normal range of motion with no joint tenderness or swelling noted. Hips, knees and ankles had normal range of motion with no tenderness or swelling.
Plaintiff was prescribed an antibiotic. Her Xanax (for anxiety), Premarin (hormone) and Lorcet (narcotic) were refilled.

August 23, 2007, is plaintiff's alleged onset date.

11/07/2007 (Tr. at 221, 348-349)
Plaintiff complained of cold symptoms and said she needed refills on her medications. Plaintiff's throat was red. Her cervical range of motion was normal. Pain, tenderness and muscle spasm were noted in the lumbar spine, straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.
Dr. Robinson prescribed an antibiotic, Lorcet (narcotic) and Xanax (for anxiety).

03/28/2008 (Tr. at 220, 349-350)
Plaintiff had a follow up on her back.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
Plaintiff was given a steroid and Lidocaine injection. Her Premarin (hormone), Xanax (anxiety) and Lorcet (narcotic) were refilled.

05/23/2008 (Tr. at 219, 350-351)
Plaintiff saw Dr. Robinson for medication refills.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. Mental status exam was normal.
Plaintiff's Xanax (anxiety) and Lorcet (narcotic) were refilled.

On July 7, 2008, plaintiff applied for disability benefits.

07/22/2008 (Tr. at 219, 351)
Plaintiff saw Dr. Robinson for medication refills.
No examination was performed.
Lorcet (narcotic) and Xanax (anxiety) were refilled.

09/08/2008 (Tr. at 228-229, 352)

Plaintiff came in for medication refills. She said the Lorcet was not helping much as she continued to have back pain.

Despite plaintiff complaining of back pain, no examination of her back was performed. Dr. Robinson did check her head, eyes, ears, nose, chest, lungs, heart, upper extremities, and lower extremities, however. All were normal.

He prescribed Percocet, another narcotic pain reliever, and referred her to a pain clinic.

09/17/2008 (Tr. at 230-240)

Plaintiff was not seen by Kenneth Burstin, Ph.D., but he reviewed her records in connection with her disability application. He found that her anxiety-related disorder was not severe. In support, he noted that she was treated with Xanax and that her medical records show no complaints of increased symptoms and no observations of increased symptoms by any treatment provider. In her administrative paperwork she reported that she is independent for shopping and had no difficulty socially.

09/28/2008 (Tr. at 247-251)

Plaintiff was seen at the Emergency Room in Lebanon[4] complaining of low back pain for the past three days. She reported smoking 1 1/2 packs of cigarettes per day.

Plaintiff was observed to be shuffling. She was able to move all of her extremities. All psychological symptoms were normal.

She was assessed with back pain and given an intramuscular injection of Toradol (non-steroidal anti-inflammatory) and was discharged with a prescription for Norco (narcotic). She was told to limit her activity and follow up with her regular doctor.

09/30/2008 (Tr. at 353)

Plaintiff saw Dr. Robinson for medication refills. She reported having gone to the emergency room because of a medication reaction.[5]

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.

Plaintiff was given a prescription for Norco (narcotic).

On October 17, 2008, plaintiff's application for disability benefits was denied.

10/23/2008 (Tr. at 302, 354)

"She continues to have severe pain and cannot do anything at home. She has appt with the pain clinic in December. She has tried Norco and Percocet but is still hurting."

---

[4]Plaintiff, who lives in Niangua, is about 8 miles from Dr. Robinson's office in Marshfield. Lebanon is about 33 miles from Niangua.

[5]I saw nothing in the hospital records showing that plaintiff complained of a medication reaction. Instead, the records show that she complained of back pain for the past three days.

14

Plaintiff exhibited pain, tenderness and muscle spasm in the thoracic and lumbar region. Straight leg raising was negative bilaterally.

Plaintiff was given a prescription for Oxycontin (narcotic).

**11/17/2008 (Tr. at 311)**

Plaintiff came in for medication refills and to complain of a sinus infection. "Back is better. The methadone[6] is helping the pain. Plaintiff's current medications included Xanax (for anxiety), Cymbalta (antidepressant), Neurontin (treats nerve pain), Lorcet (narcotic), and Savella (treats fibromyalgia).

Plaintiff exhibited pain, tenderness and muscle spasm in the lumbar spine. Upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status exam was normal.

She was given "prescriptions for the needed medications."

**12/09/2008 (Tr. at 260-261)**

Plaintiff saw Curtis Evenson, M.D., at St. John's Pain Management Center. Plaintiff reported having been treated with injections and manipulations. She did not mention the narcotics she had been taking for the past few years. She said she experienced neck and back pain but no significant arm pain. "She says it is worse with standing and bending and doing chores. Feels better if she takes an occasion just to relax." Her past medical history consisted of depression, mental illness, relatively heavy smoker, and difficulty with sleep.[7] She reported her current medications as only Norco. (Less than a month earlier, her medications included Xanax, Cymbalta, Neurontin, Lorcet and Savella and she mentioned taking Methadone. Apparently none of this was revealed to Dr. Evenson.)

Plaintiff appeared frail and moved slowly. "Examination of her back shows no surgical incision, no redness or swelling. She flexes and extends slowly. Palpation denotes multiple areas of tenderness, more so on the right SI [sacroiliac] joint. Lower extremities, hips and knees move well." Straight leg raising was negative. Patrick's maneuver[8] was "mildly positive." "Review of films from a few years back revealed

---

[6]I am unclear when plaintiff received a prescription for methadone. Methadone treats moderate to severe pain. It is also used to treat narcotic drug addiction or to help control withdrawal symptoms in patients being treated for narcotic drug addiction. It is a narcotic pain reliever.

[7]Plaintiff reported difficulty sleeping on April 23, 2003. She denied difficulty sleeping when she saw Dr. Olive on February 28, 2006. Sleeping is not mentioned in any other medical record thus far.



[8]Performed by flexing the patient's leg and putting the foot of the tested leg on the opposite knee. Pressure is applied on the superior aspect of the tested knee joint lowering the leg into further abduction.

relatively normal spine."

Dr. Evenson assessed chronic pain syndrome, tobacco abuse, depression, and malnutrition. Dr. Evenson was concerned with her poor nutrition and depression and saw those as the cause of her problems. "In regards to her pain medication I certainly would not escalate her onto high grade narcotics. We talked briefly about involving her in a chronic pain program. I told her that is available for her if she wishes. Beyond that, again I do not see that injections are going to hold for any long term for her."

12/19/2008 (Tr. at 310).

Later that day plaintiff went to see Dr. Robinson for a follow up on her complaints of back pain. "The pain clinic says it's fibromyalgia."

Again, I find it very odd that Dr. Robinson's physical exam did not include an examination of plaintiff's back. He examined her head, eyes, ears, chest, lungs, lower extremities, and her mental status. All were normal.

Despite Dr. Evenson's opinion that plaintiff should not be treated with narcotics, she was given a refill of Lorcet along with Cymbalta and Elavil (antidepressant).

12/29/2008 (Tr. at 309)

Plaintiff complained of lower back pain radiating into her right leg. Her pain was getting worse, and she said she wanted another MRI.

Examination revealed pain, tenderness and muscle spasm in the lumbar spine. Straight leg raising was negative bilaterally.

An MRI was scheduled and plaintiff was given refills of Lorcet (narcotic) and Neurontin (treats nerve pain).

01/22/2009 (Tr. at 308, 357)

Plaintiff was seen for a medication check. She had not had the MRI yet.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.

Plaintiff was given refills for Xanax (for anxiety) and Lorcet (narcotic).

02/11/2009 (Tr. at 307, 356)

Plaintiff was seen for a follow up on medication. She had her MRI the previous week but had not heard anything about the results.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

Despite plaintiff getting a refill (with 100 tablets) of Lorcet just 20 days earlier, Dr. Robinson gave her another refill of Lorcet, this time for 120 tablets.

03/18/2009 (Tr. at 262-266)

Plaintiff saw Chad Morgan, M.D., of the Springfield Neurological & Spine Institute complaining of low back pain and bilateral leg pain. She said her pain was worse with prolonged positions such as standing, walking, or sitting and was improved with heat, medication and changing positions. Treatment to date included heat, chiropractic treatments, home therapy and medications. Plaintiff rated her pain a 7 or 8 on a scale of 1 to 10. Plaintiff was now smoking two packs of cigarettes per day. She reported drinking two to three cups of coffee in the morning and about three cans of caffeinated soda per day. When asked about her drug use, plaintiff said she preferred to discuss that with the physician (apparently this had been asked by a nurse or administrator prior to plaintiff's examination). She reported very little exercise (consisting of short walks) due to pack pain. Plaintiff complained of chills, sweats, fatigue, back pain, muscle weakness, stiffness, loss of strength, tingling, weakness, cold intolerance and seasonal allergies. She denied depression, anxiety, and mental problems. Plaintiff was 5 feet 4 inches tall and weighed 124 pounds. She indicated that pain killers give her moderate relief from pain, that she was able to manage most of her personal care, that she could sit for 1/2 hour, stand for 1/2 hour, sleep for only 4 hours, and walk about 1/4 mile.

Dr. Morgan noted that he performed a "limited exam secondary to pain". Range of motion of the cervical and lumbar spine was normal. Spurling's maneuver was negative. Straight leg raising was tolerated to 80 degrees, femoral stretch was negative. Gait and station were normal. Bilateral upper and lower extremities were symmetric without tenderness, no masses. There was normal range of motion, no joint instability or laxity, upper and lower extremity strength was normal in tone. Neurologic and mental exam were normal.

Dr. Morgan found "no neurosurgical cause for her pain based upon the available MRI and today's exam." He recommended she see a physiatrist and get an EMG and nerve conduction velocity test of her right leg.

03/24/2009 (Tr. at 306, 361)

Plaintiff had a medication follow up. She reported that the neurosurgeon said there was no surgical problem to be fixed. She started taking her Neurontin again and said it was helping some.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

Dr. Robinson told plaintiff to increase her Neurontin. He refilled her Lorcet (120 more pills), and Cymbalta (antidepressant).

04/09/2009 (Tr. at 305, 360)

Plaintiff was seen for medication refills. "She is doing better."

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

17

Dr. Robinson gave plaintiff a prescription for 120 more Lorcet tablets, even though 16 days earlier he had given her a prescription for 120 Lorcet tablets and told her to take one every 4 to 6 hours for pain. Using that many pills over that time period would require her to take one every 3.2 hours, or 7.5 per day. At the rate of one every 4 to 6 hours (as prescribed), the most she would take would be 6 pills per day.

04/24/2009 (Tr. at 280-298, 362)
Plaintiff was seen in the Emergency Room complaining of chest pain. She was sweating and also reported chills. Her neck was normal, her extremities were normal, her psychological exam was normal. She reported taking Lorcet, one every four to six hours for pain. Even though the hospital record shows it was 9:35 p.m., plaintiff reported that her last Lorcet had been taken "yesterday" which is clearly inconsistent with the rate she was using them, as mentioned in the report dated April 9, 2009 (Tr. at 296).
All of plaintiff's tests were normal.
She was diagnosed with chest pain. She was told to rest, stop smoking, take one aspirin daily, and follow up with her primary care doctor.

05/04/2009 (Tr. at 304, 368)
Plaintiff was seen for medication refills. She said the Neurontin continued to help and that she was using less of her pain medication (presumably the Lorcet). There is no mention in this record of plaintiff's recent visit to the emergency room.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
Dr. Robinson refilled plaintiff's Lorcet (120 tablets) and Neurontin.

06/01/2009 (Tr. at 303, 369)
Plaintiff saw Dr. Robinson for medication refills.
Once again, despite back pain being the main reason for his treatment of plaintiff, Dr. Robinson performed no exam on her back. He checked her head, eyes, ears, chest, lungs, heart, upper extremities, lower extremities, and performed a mental status and neurological exam. All were normal.
He prescribed 120 more Lorcet tablets and refilled plaintiff's Savella (for fibromyalgia).

07/01/2009 (Tr. at 391)
Plaintiff saw Dr. Robinson for medication refills.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.
He prescribed 120 more Lorcet tablets and refilled plaintiff's Xanax.

07/13/2009 (Tr. at 375-386)
Plaintiff was not seen by Charles Bowles, Ph.D., however, he reviewed her medical records and found that her anxiety-related disorder is not severe. In support of his

18

finding, he noted she was treated with Xanax and no increased symptoms were complained of or observed.  Her mental status exams were normal.  In her administrative paperwork she reported being able to shop alone and she had no difficulty socially.

07/29/2009 (Tr. at 392)
Plaintiff was seen for medication refills and reported increased back pain.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine.  Straight leg raising was negative bilaterally.  The upper extremities had normal range of motion with no joint tenderness or swelling.  Hips, knees and ankles had normal range of motion with no tenderness or swelling.  Mental status was normal.
He prescribed 120 more Lorcet tablets, increased her Savella, and refilled her Xanax.

08/24/2009 (Tr. at 393)
Plaintiff saw Dr. Robinson for medication refills and reported continued back pain.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine.  Straight leg raising was negative bilaterally.  The upper extremities had normal range of motion with no joint tenderness or swelling.  Mental status was normal.
He prescribed 180 Neurontin capsules with five refills to be taken at the rate of one or two three times per day (or up to six per day) and 120 more Lorcet tablets.

08/24/2009 (Tr. at 388-389)
That same day, Dr. Robinson completed the first Medical Source Statement.  Despite having never found any abnormality in plaintiff's upper extremities and never recommending that she limit her lifting, he found that she can lift less than ten pounds.  He found that she can stand or walk for a total of less than two hours per day.  He found that she can sit for a total of less than two hours per day.  He found that she must periodically alternate sitting and standing.  He found that she is limited in her ability to push or pull with her lower extremities, even though every time he examined her legs she had normal range of motion in her hips, knees and ankles with swelling or tenderness and no other abnormality.  His explanation for these findings was "Her legs hurt".  He found that plaintiff can never climb, balance, stoop, kneel, crouch, or crawl.  When asked for an explanation of those findings, he left that section of the form blank.  He found that plaintiff is limited in her ability to reach in all directions, handle, finger, and feel.  However, there was not one complaint of a difficulty reaching, handling, fingering or feeling in any medical record.  When asked for an explanation for those findings, he left that blank.  He found that plaintiff should avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards, machinery, dangerous equipment, and heights.  When asked to explain why, he left that part blank.  Under "comments" he wrote, "Pain medication also would prohibit her ability to do the above."  Dr. Robinson essentially checked the box indicating the worst possible restriction on every single function listed on the form.

09/21/2009 (Tr. at 394)
Plaintiff saw Dr. Robinson for medication refills.  She reported back pain and increased anxiety.  "The Savella is helping some."

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.

He prescribed 120 more Lortab pills and refilled her Savella and Xanax. Despite having given her a prescription for 180 Neurontin capsules with five refills less than a month earlier, this record states that he provided her with another prescription for 180 Neurontin capsules with five refills.

10/19/2009 (Tr. at 399)

Plaintiff saw Dr. Robinson for a medication follow up.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.

He prescribed 120 more Lorcet tablets.

11/18/2009 (Tr. at 400)

Plaintiff saw Dr. Robinson for medication refills.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

He refilled her Xanax and prescribed another 120 Lorcet tablets.

11/23/2009 (Tr. at 396-397)

Dr. Robinson completed the second Medical Source Statement. His findings were the same as the first one except this time he indicated that she was required to use a "hand-held assistive device" for ambulation. This time, she was able to sit for six hours per day rather than the two hours per day he had marked three months earlier, and this time she was not required to alternate sitting and standing like he found three months earlier. She had no limitations in pushing or pulling with her lower extremities although he found she did have such limitations three months earlier. He did not provide any explanations for his findings, as before, and concluded the form with, "Pain medication also would prohibit her ability to do the above."

12/18/2009 (Tr. at 402)

Plaintiff saw Dr. Robinson for medical refills and reported having "pain all over."

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Mental status was normal.

He prescribed another 120 Lorcet tablets.

01/04/2010 (Tr. at 403)

Plaintiff told Dr. Robinson she was having more pain and was taking her pain medication more often.

20

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He gave her a stronger dose of Lorcet and prescribed 120 tablets.

Plaintiff's administrative hearing was held on February 4, 2010.

02/04/2010 (Tr. at 456)
Later that day, plaintiff saw Dr. Robinson for medication refills. "Husband is passing out her medication."
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He refilled her Xanax and prescribed another 120 of the higher dose Lorcet tablets. There was no discussion of why plaintiff's husband was dispensing her medication.

03/10/2010 (Tr. at 457)
Plaintiff saw Dr. Robinson for medication refills and noted an appointment with the disability doctor next week.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.
He refilled her Lorcet.

03/19/2010 (Tr. at 405-407)
Plaintiff saw Thomas Corsolini, M.D., at the request of the Administrative Law Judge. Plaintiff reported that walking and standing increase her low back pain. "Sitting can be uncomfortable."
Plaintiff was pleasant and cooperative. Her head and neck posture were normal with normal cervical spine range of motion in all directions, normal range of motion in all four extremities in all directions. Plaintiff walked very slowly but without a limp and with normal posture. Visual inspection of the back was unremarkable. Plaintiff reported discomfort at the lumbosacral midline on palpation. Plaintiff's grip strength was normal, her upper extremity strength was normal. She was able to make a fist with both hands and her hands could be fully extended. Her fingers could be opposed. Straight leg raising was nonpainful bilaterally. Lower extremity strength was normal but effort was noted to be poor. Heel and toe walk was normal, "a surprise because her regular manner of walking was so guarded and careful." Romberg test was normal. Impression was chronic lower back discomfort, with elements of depression and/or fibromyalgia. "Today's examination may be over-protective versus her true capabilities. I would estimate that Ms. Miller is capable of standing or walking at least two hours in a normal work day, but would need positional relief from episodes of prolonged sitting or standing. Bending would also need to be limited to very infrequent basis."

21

04/09/2010 (Tr. at 458)
Plaintiff was seen for medication refills.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He refilled plaintiff's Lorcet and Xanax.

05/06/2010 (Tr. at 459)
Plaintiff saw Dr. Robinson for medication refills and reported continued chronic pain.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He refilled her Lorcet and Remeron (treats depression).

On May 27, 2010, the ALJ issued his order finding plaintiff not disabled.

06/01/2010 (Tr. at 418)
Plaintiff saw Dr. Robinson for medication refills and reported that her back was "out" after twisting.
No exam was performed.
Dr. Robinson performed osteopathic manipulation and refilled plaintiff's Lorcet.

06/17/2010 (Tr. at 413)
Plaintiff saw Paul Olive, M.D., the orthopaedic surgeon whom she saw on February 28, 2006. She complained of low back pain. "She states she cannot do anything. When she tries to be active, she almost falls down because of her pain. . . . It is constant. It is every day. She states she is trying to apply for disability."
Plaintiff walked with a slow, stiff, antalgic gait. "She has marked limitation of motion of the lumbar spine. . . . The patient exhibits severe tenderness to very light palpation over the skin of her lower back." Dr. Olive had x-rays taken and noted mild degenerative changes at L3-4. He reviewed the MRI dated February 6, 2009. "She has mild degenerative changes involving the L3-4, L4-5, and L5-S1 discs. No significant spinal stenosis [narrowing] or herniated disc."
Dr. Olive assessed chronic back pain. "I went over some home exercises with her. She states she has done them before and they hurt too much for her to continue with them. Other than that, I really do no not [sic] have a whole lot to offer her."

07/01/2010 (Tr. at 420)
Plaintiff was seen for medication refills. She indicated the TENS unit was helping some.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He refilled another 120-tablet Lorcet prescription.

22

07/28/2010 (Tr. at 421)
  Plaintiff was seen for medication refills.
  On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling.
  He prescribed another 120 Lorcet tablets and refilled her Remeron.

08/11/2010 (Tr. at 422)
  Plaintiff complained of feeling dizzy and fatigued with headaches, and she said she was anxious and depressed.
  Dr. Robinson examined plaintiff's head, eyes, ears, chest, lungs, heart, and upper extremities, and performed a neurological exam, but he did not examine her back. Everything was normal, including her mental status exam.
  He refilled her Cymbalta (antidepressant) and Lorcet, even though he had just refilled her Lorcet two weeks earlier.

09/07/2010 (Tr. at 423)
  Plaintiff complained of back pain, buttock pain, and leg pain. She said the Neurontin was making her stomach sick. She reported that Dr. Olive did not believe surgery would help.
  On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
  He prescribed 120 Norco (narcotic) tablets and refilled plaintiff's Neurontin.

09/22/2010 (Tr. at 424)
  Plaintiff complained of a rash on her lower back caused by the TENS unit.
  He examined only her head, eyes, ears, and skin. He noted skin irritation on her lower back from the TENS unit patches.
  He prescribed Xanax and Norco (120 tablets, even though he had given her a prescription for 120 Norco tablets 15 days earlier) and prescribed a cream for her back.

September 30, 2010, is plaintiff's last insured date.

10/28/2010 (Tr. at 425)
  Plaintiff reported not feeling well and surmised it was from some medicine she had been prescribed. She continued to have pain.
  Dr. Robinson did not perform any exam.
  He prescribed another 120 Norco tablets.

11/17/2010 (Tr. at 425-426)

Plaintiff was seen for medication refills and said her back was about the same.

Dr. Robinson did not examine plaintiff's back. He examined her head, eyes, ears, chest, lungs, heart and upper extremities, and he performed a neurological exam. Everything was normal, including her mental status exam.

He refilled her Norco and Xanax.

12/16/2010 (Tr. at 427)

Plaintiff said she continued to have back and neck pain and was anxious and depressed most of the time.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

He refilled her Norco (narcotic).

12/16/2010 (Tr. at 415-416)

That same day, Dr. Robinson completed the third Medical Source Statement. He again marked all of the most restrictive limitations on every ability listed on the form. He did not check the box indicating that she needed a hand-held assistive device for ambulation, and this time he indicated that she was limited in her upper extremities, not in her lower extremities as before. This was because "hands swell and hurt" -- however, such complaints were never noted in any of his medical records. He provided no explanations and no comments.

01/13/2011 (Tr. at 427-248)

Plaintiff was seen for medication refills and said she thought the Cymbalta was helping some.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

He refilled her Norco and Xanax.

02/10/2011 (Tr. at 429)

Plaintiff was seen for medication refills and said she was feeling somewhat better.

On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.

He refilled her Norco (narcotic).

03/10/2011 (Tr. at 429)

Plaintiff was seen for medication refills and said she was feeling somewhat better.

No exam was performed.

He refilled her Norco and Xanax.

04/07/2011 (Tr. at 430)
Plaintiff was seen for medication refills and reported continued back pain.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
He refilled her Norco and Xanax.

04/26/2011 (Tr. at 431)
Two and a half weeks later, plaintiff said she was sick to her stomach because of nerves. She reported continued back pain and severe anxiety. Plaintiff reported that her husband had become angry and threatened to leave. This disagreement apparently was related to plaintiff's use of medication. Plaintiff asked Dr. Robinson to prescribe methadone.
He noted that she had received a prescription for hydrocodone (narcotic, also known as Norco) on April 7 for 180 tablets, and he was not allowed to prescribe more narcotics yet. He gave her samples of Cymbalta and prescribed some other medication.[9] He also noted that she was "very manipulative."

05/06/2011 (Tr. at 432)
Ten days later plaintiff saw Dr. Robinson for a medication follow up. She reported that the medication he prescribed ten days earlier did not help and was too expensive. She was back with her husband.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Mental status was normal.
He refilled her Norco.

05/31/2011 (Tr. at 433)
Plaintiff was seen for medication refills.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Mental status was normal.
He refilled her Norco and Xanax.

06/27/2011 (Tr. at 434)
Plaintiff was seen for medication refills.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Mental status was normal.
He refilled her Norco.

---

[9]The print on these records is so very tiny that this medication name is not legible.

07/19/2011 (Tr. at 435)

Plaintiff complained of sinus congestion.
On exam plaintiff had pain, tenderness and muscle spasm in her lumbar spine. Straight leg raising was negative bilaterally. The upper extremities had normal range of motion with no joint tenderness or swelling. Hips, knees and ankles had normal range of motion with no tenderness or swelling. Mental status was normal.
She was given prescriptions for an antibiotic, Norco and Xanax.

C.      *SUMMARY OF TESTIMONY*

During the February 4, 2010, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

1.      **Plaintiff's testimony.**

Plaintiff lives with her husband who is a dairy farmer (Tr. at 27-28, 32). Her husband worked in banking, but retired and has been farming since sometime between 1996 and 2000 (Tr. at 28, 33). He gets up at 3:40 a.m. (Tr. at 32). They have 360 acres and 70 to 80 head of cattle, not counting their baby calves (Tr. at 42-43). They live in a two-story house (Tr. at 43).

Plaintiff cannot work because of back pain (Tr. at 29-30). In the past four to six months, the pain has started radiating down her legs (Tr. at 30). She loses her balance and she has fallen (Tr. at 30). She cannot do anything by herself (Tr. at 30). When she goes out, she does not take her medication (Tr. at 30). She is usually hurting by the time she gets to the store because she lives in the country (Tr. at 30). Her daughter pushes the grocery cart for her (Tr. at 30). Plaintiff's daughter is a senior in college (Tr. at 30).

Plaintiff's husband helps her get out of bed (Tr. at 32). If she takes a bath, he helps her (Tr. at 33). He washes and combs her hair (Tr. at 33). He helps plaintiff get dressed, cooks supper, vacuums, and sweeps (Tr. at 33). Plaintiff has needed this help from her husband for the past year to year and a half (i.e., as far back as July 2008) (Tr. at 33). He has been helping her with the bathing for the past six to eight months (i.e., as far back as June 2009) (Tr. at 33).

26

Plaintiff has been treated for back problems for the past 15 to 20 years (Tr. at 33-34).

No one has ever suggested plaintiff try a TENS unit (Tr. at 30). Dr. Chad Morgan told plaintiff that surgery would not help her (Tr. at 30-31). No physical therapy was ever suggested, but plaintiff was given home exercises for strengthening (Tr. at 45). Plaintiff tried to do them but couldn't (Tr. at 45). Plaintiff last went to the emergency room on February 24, 2009 -- she has not been back because she does not have health insurance and cannot afford to go (Tr. at 31). Plaintiff smokes between a pack and a pack and a half of cigarettes per day (Tr. at 31). Plaintiff's doctors have told her the affects of smoking on her spine (Tr. at 31-32). She has not tried the nicotine patch -- she is trying to stop smoking on her own (Tr. at 32).

Plaintiff has no side effects from her medication other than drowsiness and dizziness caused by Neurontin and Savella (Tr. at 35-36). The Neurontin helps a little (Tr. at 36).

On a typical day plaintiff may run a tub of water, get in and sit, and "roll out of the tub". She can wash a few glasses in the sink but partially bending over really hurts. She can pull the blankets up over her bed but cannot properly make it (Tr. at 36). She can make a peanut butter sandwich to eat if her husband is not there (Tr. at 36).

At one time plaintiff helped her husband on the farm, but she can no longer do that (Tr. at 36-37). She has been unable to help her husband feed the calves for "a good year" (i.e., as far back as February 2009) (Tr. at 36-37). Plaintiff can drive into town (five miles) bu it hurts from sitting (Tr. at 37). Plaintiff was asked what she does for entertainment (Tr. at 37). "Well, I count my Yoga and my medication as kind of entertainment to me. It kind of gives me a chance to relax, and not think about -- but I do crossword puzzles. I do -- I read." (Tr. at 37-38).

Plaintiff can lift a maximum of ten pounds (Tr. at 38). Plaintiff can stand for 30 to 40 minutes (Tr. at 38). She can sit for 20 to 30 minutes (Tr. at 38). Sitting is what she does the

majority of the time, but not for long at a time (Tr. at 38). She can walk about 200 feet (Tr. at 39). If plaintiff bends over, it hurts to come back up (Tr. at 39). Lying down does not help with her pain (Tr. at 39). Despite Dr. Robinson stating in one of the Medical Source Statements that plaintiff requires a cane, she does not use one (Tr. at 40). She believes he put that on the form because she previously fell and he was concerned about her falling (Tr. at 40-41). I note that the first (and only) medical record to reflect that plaintiff had fallen is dated June 12, 2010 -- after the Medical Source Statement which indicated plaintiff needed a cane (which was dated November 23, 2009). Additionally, plaintiff told Dr. Olive that she almost falls down. She never reported falling or almost falling to Dr. Robinson.

Plaintiff's pain continues to get worse (Tr. at 41). She does not have a lot of depression, although she does have anxiety because of her pain (Tr. at 42). She has panic attacks, thinking she is not going to be able to get up (Tr. at 42). In March of 2009, it was suggested that plaintiff see a psychiatrist (Tr. at 45). She did not go (Tr. at 45).

## 2. Vocational expert testimony.

Vocational expert George Horne testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes administrative clerk, DOT 219.263-010, which is light, semi-skilled; school cook, DOT 313.381-030, which is medium, skilled; bank teller, DOT 211.362-018, which is light, skilled; loan clerk, DOT 205.367-022, which is sedentary; and receptionist, DOT 237.367--038, which is sedentary, semi-skilled (Tr. at 49-50).

The first hypothetical involved a person who could perform light work; cannot push or pull levers with the lower extremities; cannot reach above the shoulders bilaterally; can occasionally bend, twist and turn from a standing or seated position; cannot crawl, kneel, or climb ropes or ladders. The person can less than occasionally stoop and squat. The person can occasionally climb stairs. The person cannot use air or vibrating tools or motor vehicles and

28

cannot work at unprotected heights (Tr. at 50-52). The vocational expert testified that such a person could not do plaintiff's past relevant work (Tr. at 52). A person who could do light work would need to do more than occasional twisting and bending, and would need to do at least occasional stooping (Tr. at 52). Such a person would have great difficulty doing even sedentary work (Tr. at 52).

The second hypothetical was the same as the first except the person could do no more than sedentary work (Tr. at 52). The vocational expert's answer was the same as for the first hypothetical (Tr. at 52-53).

The third hypothetical was the same as the first except the person could stoop and squat occasionally (Tr. at 53). Such a person could work as a loan clerk or as a receptionist (Tr. at 53). The person could not perform light work with this residual functional capacity (Tr. at 53).

The fourth hypothetical was the same as the second except that the person could occasionally stoop and squat (Tr. at 53). Such a person could work as a loan clerk or receptionist (Tr. at 53).

If a person had the functional limitations described in the Medical Source Statements of Dr. Robinson, the person could not work due to the inability to complete an eight-hour day; and the lifting, postural, and manipulative limitations would preclude even sedentary unskilled work (Tr. at 54).

At the conclusion of the hearing, the ALJ ordered an MRI of plaintiff's lumbar spine (Tr. at 55). "Ma'am, you are going to receive a notification to go for an examination. It's free. I don't know where they will send you considering that you're so far out, but it is very important that you go." (Tr. at 55).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge James Francis Gillet entered his opinion on May 27, 2010 (Tr. at 11-18).  He found that plaintiff's last insured date was September 30, 2010 (Tr. at 11, 13).

Step one.  Plaintiff has not engaged in substantial gainful activity since August 23, 2007, her alleged onset date (Tr. at 13).

Step two.  Plaintiff suffers from the following severe impairments:  lumbar degenerative disc disease and spondylosis with L5-S1 protrusion, mild facet arthropathy, sacral strain, fibromyalgia syndrome, and nicotine abuse (Tr. at 13).  Plaintiff's alleged mental impairments are nonsevere (Tr. at 13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work but with no reaching above the shoulders bilaterally (Tr. at 14-15).  She can perform occasional bending, twisting and turning from a standing and seated position; no crawling or kneeling; occasional stooping and squatting; occasional stair climbing; no climbing of ropes or ladders; no air or vibrating tools; no motor vehicles; and no work at unprotected heights (Tr. at 15).  With this residual functional capacity plaintiff is capable of performing her past relevant work as a loan clerk and receptionist (Tr. at 18).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  OPINIONS OF TREATING AND EXAMINING PHYSICIANS

Plaintiff argues that the ALJ erred in discounting the opinion of Dr. Robinson in the Medical Source Statements and the opinion of Dr. Corsolini (a consultative examiner) that bending would need to be limited to very infrequently.

Case 6:12-cv-03221-REL   Document 20   Filed 08/05/13   Page 30 of 44

Dr. Robinson

Plaintiff takes exception to the ALJ's comment that Dr. Robinson's contact with the claimant is "limited in frequency, and is limited to dispensing pills and recording the statements of the claimant."

> The ALJ is incorrect in this finding. The record documents that Dr. Dennis Robinson has a longstanding treating relationship with Plaintiff dating from January 21, 2002 to at least July 19, 2011. . . . He is familiar with her history, has personally examined her, has seen her on her good days and bad days, has observed her response to various medications and treatments and well understands the inherently serious and limiting nature of her medical impairments. Inasmuch as no other treating source disputes his findings, it is fair to state that the record of medical evidence as a whole tends to support the findings of Dr. Robinson. Finally, as noted above, Dr. Robinson's opinion merits weight given the particularity of his findings, which provide detailed and explicit limitations on a function by function basis.

(Plaintiff's brief at page 28).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

Case 6:12-cv-03221-REL   Document 20   Filed 08/05/13   Page 31 of 44

The ALJ had this to say about Dr. Robinson's opinion:

> Dennis Robinson, D.O., opined in . . . August 24, 2009 and a November 23, 2009 medical source statements (MSS) that the claimant has significant limitations; however, the severity of the impairments is not supported by the overall evidence of record. Dr. Robinson's opinions are not supported by any treatment notes and are inconsistent with the clinical findings. Dr. Robinson's contact with the claimant is limited in frequency, and is limited to dispensing pills and recording the statements of the claimant. Therefore, Dr. Robinson's opinions are given little weight.

(Tr. at 17).

Although the ALJ addressed Dr. Robinson's opinion briefly and mistakenly noted that the frequency of contact was limited, his analysis of Dr. Robinson's opinion reflected in the Medical Source Statements is well supported.

1.     The length of the treatment relationship and frequency of examinations is clearly satisfied. Plaintiff necessarily saw Dr. Robinson no less often than every 30 days because for years she was obtaining regular prescriptions (which do not have refills) for narcotics. Although Dr. Robinson's medical notes indicate that on most occasions he performed an examination, I note that on almost every record the examination and result was word-for-word the same as for every other visit, sometimes when plaintiff was seen for back pain the examination performed did not include an examination of the back, she was sometimes assessed with anxiety when her mental status exam was normal, etc.

2.     The nature and extent of the treatment relationship factor favors giving weight to the opinion because plaintiff was seen for the impairments she now claims are disabling.

3.     A very important factor -- supportability, particularly by medical signs and laboratory findings -- clearly favors discrediting the opinion. In his medical records Dr. Robinson almost always found plaintiff's exam, both physical and mental, to be normal. When he did note an abnormality, almost always it was subjective, i.e., plaintiff reported pain and tenderness. When he noted decreased range of motion, he failed (ever) to indicate any range-

Case 6:12-cv-03221-REL   Document 20   Filed 08/05/13   Page 32 of 44

of-motion measurements or even to state whether her range of motion was severely limited or mildly limited. Although plaintiff argues that Dr. Robinson ordered and reviewed an MRI, an orthopaedic surgeon and a pain specialist determined that the results of the MRI were essentially unremarkable and Dr. Robinson never commented on it other than to place a stamp on his copy indicating it had been reviewed. On several occasions Dr. Robinson assessed lumbar pain after finding only pain on exam in plaintiff's neck and thoracic region. Dr. Robinson found that plaintiff had limited ability to handle, finger and feel. Yet not only did plaintiff never, in the ten years she saw Dr. Robinson, complain of problems with her hands, Dr. Robinson consistently found that her range of motion in her upper extremities was normal with no joint swelling or tenderness. On each form, he left blank the sections asking for an explanation of his findings. The ALJ's finding that Dr. Robinson's own medical records do not support his opinion as reflected in the Medical Source Statements is supported by the record.

4. Dr. Robinson's opinion in the Medical Source Statements is not consistent with the record as a whole, another important factor supporting a decision to discredit the opinion. As mentioned above, the orthopaedic surgeon and the pain specialist believed that plaintiff should not be treated with narcotics and should be performing physical therapy exercises, which she declined to do. At the time when Dr. Robinson was prescribing regular narcotic pain medication, an orthopaedic surgeon found that her range of motion was satisfactory, she did not have much pain with extension, and she had only minimal tenderness over the involved area. X-rays of the lumbar spine at that time were normal, the MRI of her lower back was not significant, according to the orthopaedic surgeon. A pain specialist indicated he would not use narcotics and offered plaintiff treatment in a chronic pain program, which she never did. Because Dr. Robinson referred plaintiff to the orthopaedic surgeon, a pain specialist, and a neurology and spine specialist, one would think he would review their

33

records. Yet he not only did not note the fact that plaintiff was not forthcoming about her treatment with regular narcotic pain medicine, he did not acknowledge their almost-normal findings and their recommendations for very conservative treatment. He simply continued to write prescriptions for narcotics and other medications.

The records include a notation that plaintiff refused to talk to a nurse about her drug use when she was at a spine center, her husband was dispensing her medication at one point, and their marriage suffered a blow apparently due to plaintiff's use of medication. Dr. Robinson took note of some of this, but he never addressed it other than to note that plaintiff was "very manipulative" when she begged him for more narcotic pain medicine that he was not "allowed" to dispense. And he continued to write prescriptions for large quantities of narcotic pain medication.

Clearly Dr. Robinson's opinion in the Medical Source Statements is not consistent with the other evidence in the record.

The medical records above are reported in color, with green being the treatment and blue being the tests. A quick review of the records shows that Dr. Robinson consistently prescribed large quantities of narcotic medication over a period of many years, despite specialists agreeing that narcotic pain medicine was not an appropriate treatment of plaintiff's condition. A quick review of the blue sections shows that the only abnormality ever recorded by Dr. Robinson in any of his records was subjective, i.e., plaintiff reported pain or tenderness. No other tests were ever done, no range-of-motion measurements were ever provided (and were essentially normal when measured by other medical professionals), and no discussion was ever had with regard to the MRIs and x-rays which were found to be essentially normal by other doctors.

Case 6:12-cv-03221-REL   Document 20   Filed 08/05/13   Page 34 of 44

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to give little if any weight to the opinion of Dr. Robinson.

Dr. Corsolini

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Corsolini. Dr. Corsolini found that plaintiff could stand and walk at least two hours per day. Because the ALJ found that plaintiff's residual functional capacity was for sedentary work, I do not believe there is a discrepancy with this part of Dr. Corsolini's opinion. Dr. Corsolini also found, however, that plaintiff's could bend only "very infrequently."

The ALJ stated, with respect to Dr. Corsolini:

> The record contains evidence suggesting the claimant attempted to portray limitations greater than actually present in order to increase the chance of obtaining benefits. On March 19, 2010, Thomas B. Corsolini, M.D., evaluated the claimant, and noted the claimant gave poor effort at the examination. Dr. Corsolini opined the claimant may be over-protective versus her true capabilities. Specifically, Dr. Corsolini noted "Heel and toe walk is normal, a surprise because her regular manner of walking was so guarded and careful."

(Tr. at 16).

Dr. Corsolini saw plaintiff one time in connection with her application for disability benefits. All of his findings were normal: Plaintiff's head and neck posture were normal with normal cervical spine range of motion in all directions, normal range of motion in all four extremities in all directions. Plaintiff walked without a limp and with normal posture. Visual inspection of the back was unremarkable. Plaintiff's grip strength was normal, her upper extremity strength was normal. She was able to make a fist with both hands and her hands could be fully extended. Her fingers could be opposed. Straight leg raising was nonpainful bilaterally. Lower extremity strength was normal but effort was noted to be poor. Heel and toe walk was normal, "a surprise because her regular manner of walking was so guarded and careful." Romberg test was normal.

35

The only abnormalities that appear in this record are that plaintiff walked very slowly and reported discomfort at the lumbosacral midline on palpation. These are both subjective and the ALJ's finding that plaintiff was attempting to exaggerate her condition in order to improve her chances of being awarded disability benefits is supported by the record. Plaintiff saw Dr. Morgan of the Springfield Neurological & Spine Institute for treatment, and he observed that her gait and station were normal. This slow guarded gait was observed by no other doctor in the record until this visit, and there is no other observation of an abnormal gait in any of the records that were before the ALJ.

Based on this record, the ALJ properly discounted the opinion of Dr. Corsolini regarding plaintiff's ability to bend.

Plaintiff argues that the ALJ erred in assessing a residual functional capacity that does not contain a function-by-function assessment of plaintiff's ability to perform work-related activities. "In this case, the ALJ has made no findings in a significant number of areas that are required by the Commissioner to fulfill the requirements of the regulations. While it might be argued that we should infer the ALJ meant to find no limitations in these areas, a proper and complete RFC should address this more clearly. . . . This is more than an academic point considering exertional and strength-related limitations flowing from Plaintiff's lumbar degenerative disc disease and spondylosis with L2-S1[10] protrusion, mild facet arthropathy, sacral strain and fibromyalgia syndrome. There are likely environmental limitations from Plaintiff's found severe impairment of nicotine abuse."

---

[10]I note that both plaintiff and the ALJ referred to L2-S1 protrusion. However, the second lumbar disc is not adjacent to the sacrum, and the disc protrusion noted was at L3-4, L4-5, and L5-S1, not at L2.

36

A claimant's RFC is the most an individual can do despite the combined effects of all of his or her credible limitations. See 20 C.F.R. § 404.1545. An ALJ's RFC finding is based on all of the record evidence, including the claimant's testimony regarding his or her symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p. An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness, and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96-7p. Although the residual functional capacity formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather, an ALJ has the duty to formulate a claimant's residual functional capacity based on all the relevant, credible evidence of record. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."); 20 C.F.R. § 404.1545; SSR 96-8p.

Although plaintiff quoted what appears to be a long and significant list of impairments, the residual functional capacity assessment is concerned with a claimant's limitation from her impairments, not the impairments themselves (absent a listing argument).

Lumbar degenerative disc disease. Dr. Olive, an orthopaedic surgeon, described plaintiff's degenerative changes as "mild." No other doctor made any more restrictive finding with respect to plaintiff's lumbar degenerative disc disease.

Spondylosis. Dr. Morgan, a spine specialist, is the only doctor who commented on spondylosis, and his findings as far as plaintiff's functional abilities were normal: Range of motion of the cervical and lumbar spine was normal. Spurling's maneuver was negative. Straight leg raising was tolerated to 80 degrees, femoral stretch was negative. Gait and station were normal. Bilateral upper and lower extremities were symmetric without tenderness, no masses. There was normal range of motion, no joint instability or laxity, upper and lower extremity strength was normal in tone. Neurologic and mental exam were normal.

Disc protrusion. The January 10, 2006, MRI is the only medical record to point out disc protrusion. Dr. Olive, an orthopaedic surgeon, found that the disc protrusions were "not clinically significant" and he recommended home exercises as therapy.

Mild facet arthropathy. The only place in the record where mild facet arthropathy is noted is in an MRI performed on February 6, 2009, at the request of Dr. Morgan, a spine specialist (Tr. at 275). However, Dr. Morgan did not find any limitations as a result of that MRI: Plaintiff's range of motion of the cervical and lumbar spine was normal. Spurling's maneuver was negative. Straight leg raising was tolerated to 80 degrees, femoral stretch was negative. Gait and station were normal. Bilateral upper and lower extremities were symmetric without tenderness, no masses. There was normal range of motion, no joint instability or laxity, upper and lower extremity strength was normal in tone. Neurologic and mental exam were normal. Dr. Morgan found "no neurosurgical cause for her pain based upon the available MRI and today's exam."

Sacral strain. Dr. Olive is the only doctor to have concluded that plaintiff may be suffering from "a chronic strain." This was based on the fact that x-rays of her lumbar spine were normal and the MRI of her lumbar spine showed no clinically significant abnormalities. He found plaintiff's range of motion satisfactory. She did not have much pain with extension.

38

She had minimal tenderness over the involved area. She had no sign of trochanteric bursitis or hip pathology. Examination of the hips, knees, and ankles was unremarkable. Neurologic exam was intact. He recommended home exercises and mentioned no functional restrictions.

Fibromyalgia syndrome. Dr. Evenson, a pain specialist, is the only doctor to have suspected fibromyalgia as a condition. When plaintiff saw Dr. Evenson, she said her treatment had consisted of manipulation and occasional injections. She did not tell him that she had been taking narcotic pain medication regularly for almost six years. She reported her current medications included only Norco, a narcotic. Less than a month earlier, her medical records reflected that she was taking Xanax, Cymbalta, Neurontin, Lorcet (narcotic) and Savella and she mentioned taking Methadone, which is also a narcotic. Dr. Evenson's physical exam was normal with the exception of some tenderness (which is subjective), and he noted that plaintiff's MRI of her spine was "relatively normal." He was most concerned with her apparent depression and her malnutrition. He stated that he would "certainly not" treat her with narcotic pain medication and did not believe that the injections she had been getting would provide any long term benefit given his examination and the scans. He assessed chronic pain syndrom and "suspect[ed] almost a fibromyalgia" -- suggesting that he was having trouble coming up with a medical reason for plaintiff's alleged severe pain. But again, the diagnosis is not nearly so relevant as the functional restrictions caused by the diagnosis, and Dr. Evenson did not suggest any functional restrictions.

Nicotine abuse. The record shows that during the course of plaintiff's medical treatment, her smoking increased from one pack of cigarettes per day to one and a half packs a day to two packs a day. The records also show that she was encouraged by her doctors to quit. She testified at the administrative hearing that she has been made aware of the affects of smoking on her spine, and that she is trying to quit smoking on her own. The evidence shows,

39

however, that instead of trying to quit, plaintiff actually doubled her smoking habit during the course of these medical records. It does not appear that there are any functional limitations as a result of her smoking, and indeed plaintiff does not identify them other than to suggest that there "are likely environmental limitations from Plaintiff's found severe impairment of nicotine abuse." There is no credible evidence in the record that plaintiff's heavy smoking resulted in any functional limitations.

"Sedentary work" is defined in the regulations as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). The regulations go on to state that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties," and that "[j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id. With respect to sedentary work, SSR 83-10 further elaborates that

> By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

Here, the ALJ made specific findings on many of plaintiff's functional abilities, and the ALJ did not violate SSR 96-8p by limiting plaintiff's residual functional capacity to sedentary work as defined in the regulations with several additional non-exertional and postural limitations. See Depover v. Barnhart, 349 F.3d 563, 568 (8th Cir. 2003).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinions of Drs. Robinson and Corsolini as discussed above and that the residual functional capacity assessment of the ALJ is not defective and is supported by the credible evidence in the record.

## VII.  NON-COMPLIANCE

Plaintiff argues that the ALJ erred in finding that plaintiff was noncompliant with physical therapy and pain management because he did not determine whether or not failure to follow prescribed treatment is justifiable.  Plaintiff argues that "the record shows that she has had financial difficulties pursuing medical care beyond that of her treating doctor. Plaintiff has testified that she has no insurance and all specialist care must be paid out of pocket."  This argument is without merit.  Plaintiff was clearly able to afford many, many doctor visits and a lot of prescription medication.  Additionally, smoking two packs of cigarettes per day would cost at a minimum $300 per month.  Finally, her financial affidavit in this case, completed on April 16, 2012, shows that plaintiff spends $260 per month on cell phones, $58 per month for cable television, $69 per month for internet service, and $124 per month for her daughter's student loan payment (and she testified more than two years earlier than her daughter was a senior in college and therefore it is plaintiff's choice to take on her daughter's bills).  This comes up to more than $800 per month plaintiff spends on entertainment, someone else's financial responsibility, and smoking (which is detrimental to her health), all to the exclusion of additional medical care which suggests that plaintiff does not place much importance on physical therapy and pain management which could reduce her symptoms.  This coupled with the notations in the medical records regarding plaintiff's narcotic use, her attempt to get more narcotics than even Dr. Robinson was willing to prescribe, her being "very manipulative," and her issues with her husband regarding his dispensing her medication and his threatening to

41

leave in relation to her medication use all suggest that lack of funds is irrelevant, and plaintiff's motivation is to treat her symptoms with nothing more than narcotic medicine.

## VIII.   NEWLY-OFFERED EVIDENCE

Plaintiff argues that the Appeals Council erred in refusing to remand the case due to the newly-presented evidence, i.e., the medical evidence post-dating the ALJ's decision. This evidence is summarized above with the medical evidence considered by the ALJ.

Judicial review under 42 U.S.C. § 405(g) is confined to the evidence which was before the Commissioner at the time of his decision.  42 U.S.C. § 405(g) (noting that a reviewing court's decision is based "upon the pleadings and transcript of record").  While additional evidence may in limited circumstances form the basis for remand under sentence six of section 405(g), a claimant must show that the new evidence is material and that there was good cause for the failure to incorporate that evidence into the record before the Commissioner.  Mouser v. Astrue, 545 F.3d 634, 636-37 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)).  To be material, new evidence must be non-cumulative, relevant, and probative of a claimant's condition during the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination. Krogmeier v. Barnhart, 294 F.3d 1019, 1025 (8th Cir. 2002).  "Where, as here, the Appeals Council considers new evidence but denies review, [the reviewing court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."  Davidson v. Astrue, 501 F.3d 987, 900 (8th Cir. 2007).  In this case, the Appeals Council appropriately considered the evidence submitted by plaintiff after the ALJ's decision and properly found that the ALJ's decision was supported by substantial evidence in the record as a whole.

42

In making her argument, plaintiff argues that the Appeals Council's March 21, 2012, letter "simply stated" that "we considered the reasons you disagree with the decision. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." However, the Appeals Council actually stated as follows:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. at 1-2).

The Appeals Council's order specifically lists all of the additional evidence submitted by plaintiff after the ALJ's decision (Tr. at 4-6). Contrary to plaintiff's contention, the Appeals Council expressly considered the additional evidence she submitted and found that review of the ALJ's decision was unnecessary despite those additional records.

While plaintiff insists that the additional medical evidence is both "new" and "material," it is actually neither. First, many of the medical records submitted by plaintiff post-date the ALJ's decision and are therefore not relevant to her appeal. 20 C.F.R. § 404.620 (an application is effective through the date of the ALJ's decision). More importantly, plaintiff cites to nothing in those records to show that her condition during the relevant time period was different than what the ALJ found by reviewing the evidence before him. In fact, plaintiff herself states that the additional evidence "clearly documents Plaintiff's ongoing treatment with Dr. Robinson and confirms that the doctor's clinical evaluations and opinions have remained essentially unchanged throughout the record." As for the Dr. Robinson's third Medical Source Statement form dated December 16, 2010 -- not only was it completed outside the relevant time period, but even plaintiff admits that it was simply "consistent with his earlier statements" which the ALJ properly discounted.

43

Therefore, I find that the Appeals Council properly declined to remand the case for further consideration of the new evidence submitted by plaintiff.

IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 5, 2013